MURRAY CO. v. CONTINENTAL GIN CO.

(Circuit Court of Appeals, Third Circuit. January 6, 1907.)

No. 20.

1. PATENTS—ASSIGNMENTS—ACKNOWLEDGMENT.
The acknowledgment of an assignment of a patent relates to the date of the assignment.

2. SAME—INFRINGEMENT—FEEDERS FOR COTTON GIN.
The Murray patent, No. 472,607, for an improvement in apparatus for elevating, distributing, and feeding seed cotton to gins by pneumatic action, the principal feature of which is an automatic valve produced by the cotton itself whenever it becomes choked in a chute, which shuts off the suction and the delivery of cotton to that particular chute until the stoppage is overcome, was not anticipated, and, while the elements of the machine are old, discloses a new and patentable combination which produces new and decidedly useful result. Also held infringed as to claims 1, 2, 9, and 12.

3. SAME.
    The Murray patent, No. 644,532, for improvements in cotton elevators
    and gin feeders, is void for anticipation.

Appeal from the Circuit Court of the United States for the District
of Delaware.
    See 126 Fed. 533.

Oliver Mitchell and Edmund Wetmore, for appellant.
Melville Church, for appellee.

Before DALLAS and GRAY, Circuit Judges, and CROSS, District Judge.

CROSS, District Judge. The bill of complaint in this cause relates to letters patent No. 472,607, 488,446, and 644,532, and alleges that they have been infringed by the defendant. As to No. 488,446, however, counsel for the complainant has, since the commencement of the suit, abandoned all claim for relief thereunder, and it will, therefore, require no further mention. No. 472,607 was issued April 12, 1892, to Stephen D. Murray, assignor to William Burr and John H. Deems, for new and useful improvements in apparatus for elevating, distributing, and feeding seed-cotton to gins, and the bill of complaint alleges that the defendant has infringed claims Nos. 1, 2, 9, and 12 thereof, which are as follows:

"(1) In apparatus for elevating, distributing, and feeding seed-cotton to gins, the combination, with a suction pipe or tube, of a box or casing having side air-passages and a central screened space and a chute or feeder communicating with said space, substantially as described.

"(2) In apparatus for elevating, distributing, and feeding seed-cotton to gins, the combination, with a suction pipe or tube formed in its under side with an opening of a box or casing having a central space communicating with said pipe or tube and provided with side air-passages having inner screen-walls and a chute or feeder communicating with said central space, substantially as described."

"(9) In apparatus for elevating, distributing, and feeding seed-cotton to gins, the combination, with the chute or feeder, of a set of feed-rollers supported at the bottom of said chute or feeder and means for regulating the feed of said rollers, substantially as described."

"(12) The combination, with a suction-pipe, of the box or casing constructed of two or more central spaces and provided with the screened air-passages and a chute or feeder suspended beneath each of said central spaces, substantially as described."

Before discussing the merits of the case, we will first briefly consider the point made on behalf of the defendant, that the complainant has not shown title to this patent. Several alleged defects are set forth in the brief, but the only one urged at the oral argument was that notwithstanding the assignments, so far as appears, were duly executed and delivered at the times they were respectively dated, they nevertheless, having been acknowledged several years subsequently, only took effect, in the absence of strict proof of the assignments as at common law, from the dates of their acknowledgment, and that under the evidence no infringement of the patent was shown between those

dates and the time of filing the bill of complaint herein. In volume 1 of Am. & Eng. En. of Law, title "Acknowledgments," p. 524, the following rule is laid down:

"In the absence of a statute designating the period within which acknowledgments must be made, it is immaterial when a deed is acknowledged. The acknowledgment may be made after bringing suit when the instrument is offered in evidence."

It is true that in the case of Hollingsworth v. Flint, 101 U. S. 591, 25 L. Ed. 1028, where the acknowledgment and privy examination of a married woman was made after the commencement of the suit, it was held that the deed could not be offered in evidence; but the decision was put by Mr. Justice Harlan expressly upon the ground that at the time of the commencement of the suit the deed had not been acknowledged as required by the Texas statute in order to pass the title of a married woman under the law of that state. In Doe v. Dugan, 8 Ohio, 87, 31 Am. Dec. 432, a deed executed by a sheriff while in office was acknowledged by him after his term of office had expired, and it was held that such acknowledgment related back to the time of the execution of the deed. In Lanning v. Dolph et al., Fed. Cas. No. 8,073, a deed was offered in evidence in an action in ejectment, and objection was made to its admission because the deed was acknowledged and recorded after the suit was brought. Mr. Justice Washington, who tried the case, held the objection invalid, since the acknowledgment and recording related back to the execution of the deed. An acknowledgment is nothing more or less than a substitute method of proving a deed, and does not affect its validity in the least. Section 4898 of the Revised Statutes, as amended by Act March 3, 1897, c. 391, 29 Stat. 692 [U. S. Comp. St. 1901, p. 3387], simply provides a new method of proof. The evident intent of the act was to substitute proof of execution by acknowledgment, instead of by the production of the subscribing witness, if there were one, or proof of the handwriting of the assignor, if there were no subscribing witness. In De Laval Separator Co. v. Vermont Farm Mach. Co. (C. C.) 109 Fed. 813, it was held that assignments which were acknowledged before the passage of that act were admissible in evidence thereunder, and that the act referred "to the time," to use the language of the court, "when the acknowledgment is produced in evidence, rather than to the time when it was taken." The rule thus laid down was approved by the Circuit Court of Appeals for the Eighth Circuit in Lanyon Zinc Co. v. Brown et al., 115 Fed. 150, 53 C. C. A. 354. The complainant in this case had in his possession, and produced at the hearing, assignments of the patent in suit acknowledged by the assignors, which showed at least a prima facie title thereto in the complainant.

On the part of the defendant it is maintained that the Munger patent, No. 308,790, dated December 2, 1884, the Sailor patent, No. 362,041, dated April 26, 1887, and the Schulze patent, No. 478,473, dated July 5, 1892, narrowed the art to such an extent that the complainant's patent, No. 472,607, must be narrowly and strictly construed in order to maintain its validity, and that thus construed the defendant's ap-

paratus did not infringe claims 1, 2, and 12 thereof. It is unnecessary to consider at any considerable length in this connection the Munger or the Sailor patent, although they both disclose a pneumatic cotton elevator, since the former has only a belt distributor, and the latter valves or deflectors, as the patentee calls them, whereby the passage of the cotton into the different vacuum boxes, arranged in series, is regulated, not automatically, but by hand. The Schulze patent undoubtedly represents the highest development of the art prior to the Murray patent under consideration, and it was upon that patent that counsel for the defendant mainly relied to show anticipation. It is quite true that the Schulze and Murray machines are in some respects alike, and from a mere cursory examination they might seem to be so much alike that very little, if anything, of novelty or invention could be discovered in the Murray patent; but, when carefully examined, it will appear that, while the elements embodied in the Murray patent are old, they are, nevertheless, combined and organized in such a way as to accomplish a new and decidedly useful result. What Murray more especially claims by his patent is an automatic valve produced by the seed-cotton itself, so that, when the cotton becomes choked in the chute and fills it to the top of the screen-walls, the air suction is entirely cut off, and the delivery of cotton to that particular chute is suspended until the stoppage in the chute is overcome, or, adopting the language of the patentee:

"When the cotton accumulates in the feeder too fast and reaches to the top of the screen-walls of the space 5, it is evident that the suction from pipe or tube 1 will be cut off and the cotton will cease to be drawn in; but as soon as one or more of the feeders have fed out sufficient of the cotton to allow some part of the screen-walls to be free or open, the suction again becomes effective in the manner already explained."

It is true that the claims do not in terms refer to the automatic action of his system, but we think such reference is wholly unnecessary. He sets out the orderly arrangement of the parts intended to produce the result, and which, as the evidence shows, do produce the result he has described in his specifications. The patent cannot be read without discovering that the main object of the inventor was to install an automatic valve produced by the seed-cotton itself, and which would at all times, in case of chokage of the cotton, prevent the cotton in the chute from rising above the bottom or lower side of the cotton pipe. Under his system the choked cotton, if any, is all contained within the perpendicular chute, and is in a position whence, as soon as the choke is relieved at the bottom of the chute, the cotton will fall by gravity; whereas, not only in the Schulze system, but also in all of the other systems, the cotton when choked is liable to be forced ultimately beyond the chute itself into the internal portion of the cotton pipe, from which position it cannot, under any circumstances, be released by gravity. The result achieved by Murray's device is accomplished by having the cotton feed-pipe located above the air pipe, as also by so arranging the screened air-passages that they do not extend upwardly above the bottom of the cotton feed-pipe. Schulze approximates this same result, but does not attain it, nor was it in his mind,

since his screened air-passage extends upward to the very top of the cotton feed-pipe, with the result that, when the cotton becomes choked in the chute, it will continue to fill up the chute, as it will also in the Murray system, until the air suction has been completely shut off by the choked cotton, but this will not happen under the Schulze device, owing to the height and location of the screen, until the cotton will have been forced over the bend or angle of the cotton-pipe and into the lateral portion thereof, whence it cannot be relieved by its own weight. Furthermore, Schulze, in order to accomplish what he did, deemed it necessary to adopt, and did adopt, various mechanical cut-offs and valves which are unnecessary to the Murray patent. Our conclusion, therefore, is that Murray's patent discloses a decided advance in the art, and very clearly shows novelty and invention.

What has been said pertains more appropriately to claims 1, 2, and 12, but we think claim 9 is also valid. It relates to feed-rollers supported at the bottom of the chute, with means to regulate the feed of the rollers. The use of such rollers was undoubtedly old in the art, but as theretofore used the rollers were located at or near the gin. Formerly the cotton fell from the chute upon a moving apron or conveyor-belt, which carried it to the feed-rollers, whence it was fed to the gin. Murray does not require the conveyor-belt, and locates the feed-rollers directly at the bottom of the chute, where they aid in releasing the cotton from the chute, a function which they did not at all perform before. Again, they pay it out at a predetermined rate, which may differ at every chute, whereby, in connection with the other elements of the combination, no more cotton is elevated by the machine than can be properly distributed and fed out. The claim, therefore, discloses in our opinion a true combination, and not a mere aggregation, and is also valid.

The defendant's device clearly infringes all of the claims in controversy, unless such claims are to be read with literal exactness. The defendant has unquestionably adopted and embodied in its apparatus all of the essential elements of the Murray patent, except that it claims that it does not use side air-passages and a central screened-space, emphasizing particularly the words "passages" and "central." It contends that both Munger and Schulze have a side air-passage and a screened-space, which space, however, is not central between side air-passages, and that consequently, in order to avoid the claims of those patents, and to disclose novelty, Murray was compelled to claim as he did. But, as already stated, neither Munger nor Schulze accomplishes what Murray did, nor do they show the same mode of operation. Murray devised what may very properly be called a system or mode of operation, whereby certain old elements of a cotton elevator and distributor, as the result of new organization and arrangement, produced automatic regulation of the device by the cotton itself, and it would be most unfortunate in view of what he has accomplished if we were compelled to construe his claim so narrowly that an infringer could appropriate the entire principle of his invention by using one air-passage, instead of two, and simply conjuring with the meaning of the word "central."

Counsel for the complainant have indicated how the different

149 F.—63

elements comprised in the claims of the Murray patent may be so correlated and rearranged as perhaps to more clearly express Murray's invention, without doing violence to the claims themselves. Such rearrangement is as follows:

"In apparatus for elevating, distributing, and feeding seed-cotton to gins, in combination, a cotton pipe, an air pipe having side air-passages, a screen space organized, as described in the specification, below the cotton pipe, a chute or feeder communication with said space, the said space being central between the cotton pipe, air pipe, and chute, as described."

It would seem that the word "central," as used in the claims, is susceptible of the meaning they have attached to it. The claims do not show with entire precision what is meant by the words "central space"—that is to say, it does not clearly appear with what other elements the "central space" must be arranged in order that it may properly be defined as "central"—but, wherever it is located, we certainly find nothing in the claims which imperatively demands that it be located, as claimed by the defendant, between the side air-passages. It would seem that "central space," as used, may mean no more than the space inclosed within the box or casing, and that the phrase "side air-passages" is met by locating them upon one side only, as well as upon both sides. The language used does not require air-passages located on both sides, or on opposite sides, or anything equivalent thereto. There must be side air-passages, but that requirement would be met if there were a plurality of them located upon one side, equally as well as it would be if they were located upon two sides, or upon opposite sides. What has been said applies more especially to claims 1 and 2. Claim 12 is still more general, for in it there is nothing whatever said about side air-passages. All that this claim requires is that there shall be air-passages, and that they shall be screened. Since this is so, there surely is no invention in merely reducing the number of air-passages from two to one, as the defendant has done; nor, again, would such reduction conflict with the Schulze patent or other prior patents, because it is the location of the screened-passages in the Murray patent which, in combination with the other elements, produces its automatic feature, and this in principle the defendant has adopted. Upon the whole the complainant's interpretation of the claims is not unreasonable, and we would feel entirely justified in adopting it were it necessary under the circumstances to do so, in order to sustain the patent, but we do not think it is. Murray's invention, considered as an entirety, rested largely, as already stated, in the automatic valve produced by the cotton itself whenever it became choked in the chute, and which automatic function was accomplished by a new organization of old elements set forth in the claims as interpreted and described in the specifications, and it is this automatic feature which the defendant has appropriated by a like or an equivalent organization of the same elements. The defendant's device has, it is true, but a single screened air-passage, but that, as we have seen, is immaterial, since it is located and arranged in relation to the other elements, so as to perform the identical function which the screened air-passages of the Murray patent perform.

That claim 9 has also been infringed is too apparent to require extended remark. The claim provides for "a set of feed rollers supported at the bottom of said chute or feeder." The defendant contends that the phrase "supported at the bottom" requires the said rollers to be attached to, and to form a part of, the elevator and distributor, while in its device the feed-rollers, although supported directly at the bottom of the chute, are nevertheless detached from and are not a part of it, but of the gin. In other words, it is claimed that since the feed-rollers have been, as it were, sawed apart from the chute and removed therefrom by the width of a saw-cut, infringement of the Murray patent has been avoided. The mere statement of the proposition shows its lack of merit. The entire principle, and, indeed, the very language of the claim, is sought to be appropriated by transparent evasion.

Patent No. 644,532, the second in suit, is invalid. It was clearly anticipated by the Munger patent, No. 680,165. The only apparent difference between the construction described in claim 8, the only one relied upon, of the Murray patent now under consideration and the Munger patent, is that the Murray patent has a plurality of feed-rollers, whereas Munger has a single feed-roller which co-operates with an adjustable or spring pressed breast, a mechanical equivalent. The Murray patent does indeed claim a screw conveyor, whereas in the Munger patent air is used as the conveyor, but, even if these conveyors are not equivalents, still a screw-conveyor is clearly portrayed and described in a prior Munger patent, No. 547,671, where it is located substantially in the same place and performs practically the same function that it does in the patent in suit.

Upon the whole case, therefore, we conclude that the first patent in suit, No. 472,607, is valid, and as to claims 1, 2, 9, and 12, has been infringed by the defendant, and that the second patent in suit, No. 644,532, is invalid.

The decree below should be reversed, with costs, and a decree entered in conformity with the views hereinabove expressed.