Luke TOROSIAN et al., Plaintiffs,

v.

NATIONAL CAPITAL BANK OF
WASHINGTON, Defendant.

Civ. A. No. 2110–69.

United States District Court,
District of Columbia.

Feb. 24, 1976.

Anthony Z. Roisman, Washington, D. C., for plaintiffs.

George A. Didden, III, Washington, D. C., for defendant.

## MEMORANDUM

GASCH, District Judge.

This matter came on for hearing on cross-motions for summary judgment filed by the last remaining plaintiffs and defendant in this case. The only substantive issue before the Court is whether a material issue of fact exists as to the usurious or non-usurious nature of three loans that were made to plaintiffs Luke and Peggy Torosian by defendant, the National Capital Bank of Washington.[1] Resolution of this issue is governed in part by prior rulings in this case, as elaborated *infra.* The Court must also decide a novel issue, however: whether, for purposes of demonstrating compliance with the District of Columbia usury laws,[2] banks may compute the interest rate on personal unsecured installment loans according to the so-called "United States Rule" of interest computation, or whether the residuary method must be applied.

For the reasons set forth below, the Court has determined that computation of interest according to the U.S. Rule satisfies D.C.'s usury statute.. Applying this rule of law to the undisputed facts relevant to the instant motions, the Court must grant defendant's motion for summary judgment and deny plaintiffs' motion.

## PROCEDURAL BACKGROUND

The complaint, as subsequently amended, alleged that the District of Columbia National Bank and two other defendant banks—National Savings and Trust Company, and National Capital Bank of Washington—had violated the District of Columbia usury statute, the National Bank Act,[3] and section one of the Sherman Act.[4] The complaint alleged that defendants had charged and conspired to charge usurious rates of interest on certain loans, later defined as personal unsecured installment loans, that had been made to the named plaintiffs and the plaintiff class. The theory underlying plaintiffs' complaint was that the declining balance of principal must be taken into account in computing interest for purposes of the relevant D.C. usury statute, and that if the interest were so computed on the loans made to plaintiffs, the interest exceeded the lawful rate of eight percent. Plaintiffs sought statutory and punitive damages, plus declaratory and injunctive relief.

Early in the course of this litigation, the Court severed the usury and antitrust counts,[5] certified the class action, and ordered separate trials for each defendant bank on the usury count.[6] The Court further ordered that the litigation of the usury count would proceed first against the first named defendant, the District of Columbia National Bank.[7] The litigation against D.C. National resulted in the issuance of two opinions that decided issues of direct relevance here.

The first opinion[8] granted partial summary judgment for plaintiffs on the usury issue, holding that by failing to take the declining balances of principal into account in computing interest, and by charging interest in an amount equal to more than the lawful 8% if the declining balance were taken into account, D.C. National Bank had exacted usurious interest on the personal unsecured installment loans at issue on that motion.

1. Hereinafter sometimes referred to as "NCB".

2. 28 D.C.Code §§ 3301, 3303 (1967 ed.).

3. 12 U.S.C. §§ 85, 86 (1964).

4. 15 U.S.C. § 1 (1964).

5. Memorandum-Order filed June 30, 1971.

6. *Cohen v. District of Columbia National Bank,* 59 F.R.D. 84 (D.D.C.1972).

7. *Id.*

8. *Cohen v. District of Columbia National Bank,* 382 F.Supp. 270 (D.D.C.1974).

The second opinion, filed July 17, 1974, denied plaintiffs' motion for summary judgment on two issues: (1) whether the charges for life insurance, credit checks and processing fees which were included in the amounts due on the loans amounted to added interest; and (2) whether the bank had exacted usurious interest "knowingly" within the meaning of the National Bank Act. The opinion also ordered that notice would issue forthwith to the class of D.C. National Bank borrowers.

After issuance of the second opinion, D.C. National Bank and the second named defendant, National Savings and Trust, entered into a full settlement agreement with plaintiffs. Notice to the class of borrowers holding loans with the two settling banks was effectuated by publication in local newspapers on November 1, 1974. By Memorandum-Order filed May 27, 1975, the Court approved the settlement.

Approval of the settlement between plaintiffs and the first two named defendants left for adjudication only the usury and antitrust claims against the National Capital Bank of Washington. Plaintiffs have raised no objection to NCB's contention that a grant of summary judgment for NCB on the usury count would dispose of the antitrust claim as well.[9] From plaintiffs' silence the Court concludes that plaintiffs have either abandoned the antitrust claim or they agree with NCB that summary judgment for defendant on the usury claim will require the entry of summary judgment for defendant on the antitrust claim. In view of NCB's success on the merits of the usury claim, it seems obvious to the Court that plaintiffs' claim against NCB for conspiracy to commit usury must fail. Accordingly, summary judgment will enter for defendant on both claims. Before reaching the merits of the instant motions, however, certain matters relevant to the status of this case as a class action must be clarified.

## DEFINITION OF THE PLAINTIFF CLASS, AND WHETHER THE CLASS IS BOUND BY THIS JUDGMENT

In its motion papers and during the oral argument of these motions, National Capital Bank raised questions as to the definition of the certified class of plaintiffs,[10] and as to the binding effect on the class of the judgment to be entered on these cross-motions. Defendant contends that the class members should be bound by the judgment in favor of defendant, even though no notice of the class action has been issued. Moreover, defendant argues that the definition of the class should be modified to exclude borrowers who had not paid more than the principal plus interest at the maximum legal rate on outstanding loans before this suit was filed on July 28, 1969.

 Defendant's contention that the class should be bound by the judgment

---

**9.** See Defendant's Memorandum in Support of Summary Judgment for Defendant, at 3.

**10.** At oral argument NCB also questioned whether any class of NCB borrowers had in fact been certified in this action. NCB noted that the Memorandum-Order of October 18, 1972, which ruled on the plaintiffs' class certification motion, mentioned only D.C. National Bank by name in discussing the class action prerequisites. See Cohen v. District of Columbia Nat'l Bank, 59 F.R.D. 84, 88–90 (D.D.C. 1972). From this omission of any explicit reference to NCB, NCB argued that certification of a class of NCB borrowers had been deferred.

Despite the ingenuity of NCB's argument, the existence of a certified class of NCB borrowers cannot seriously be disputed at this late date. Read in the context of the case, the intention fairly indicated by the 1972 Memorandum-Order is to certify three classes of borrowers, each composed of borrowers from a single defendant bank. The Rule 23(a) considerations that were discussed in the Memorandum in connection with D.C. National applied equally to the borrowers from each defendant bank. In fact, NCB apparently understood the Memorandum-Order as certifying a class of NCB borrowers, for NCB's Memorandum in support of its motion for summary judgment states that "by . . . Order dated October 18, 1972, the Court severed plaintiffs' class into separate units comprising the various borrowers from each bank." Defendant's Memorandum at 1.

herein must be rejected. For more than two years defendant NCB has been on notice that a judgment in its favor would not be *res judicata* as to the class members so long as notice had not been issued to the class. A Memorandum-Order that was filed in this case on August 2, 1973, explicitly acknowledged this principal[11] in approving the proposal of D.C. National Bank to defer sending notice to the class of D.C. National's borrowers until after ruling on the merits of the usury issue. Although National Capital Bank has never formally requested that notice to the class of NCB borrowers be deferred until after adjudication of the usury claim, NCB nonetheless moved for summary judgment in its favor, knowing that notice had not been issued and that judgment in its favor would not bind the class. Under these circumstances, NCB has waived any objection it may have had to the issuance of judgment on the usury claim prior to the sending of notice to the class.[12]

NCB also seeks to alter the definition of the class. As defined in the Memorandum-Order that certified the plaintiff class, the class includes borrowers from each defendant bank "who, because of the computational method used and the various charges imposed, have been allegedly required to pay money in excess of the statutory limit of 8 percent per annum on the loans which they have transacted with a *particular* bank."[13] The same Memorandum-Order further describes the class as "limited to only those persons who have obtained an unsecured installment loan from a single bank."[14] The class is thus limited to persons who had "obtained" or "transacted" loans with NCB as of the filing date of this suit, but no other limitations have been imposed on the class.

National Capital Bank now seeks to exclude from the class those borrowers who had not yet made payments amounting to more than principal plus legal interest as of the date when this action was filed. NCB reasons that under District of Columbia law no cause of action accrues to recover payments of usurious interest until payments have been made in excess of principal plus legal interest,[15] and accordingly, this suit was filed prematurely insofar as it bases claims for relief on loans encompassed within the challenged category. This rationale, if adopted, would mandate the dismissal of the Torosians' claims for relief based on the third loan they transacted with NCB. This loan was outstanding on July 28, 1969, when plaintiffs filed this suit, but plaintiffs had not repaid an amount equal to principal plus legal interest on that date.

■ Defendant's objection to the definition of the class and the maintenance of the cause of action based on the Torosians' third loan must be rejected as waived, for NCB participated fully in the briefing and argument of the class certification issue in 1972, yet did not raise the prematureness issue at that time.[16] Having failed to raise this objec-

---

11. *See also Haas v. Pittsburgh National Bank*, 381 F.Supp. 801, 806 (W.D.Pa.1974); *Alameda Oil Co. v. Ideal Basic Industries, Inc.*, 326 F.Supp. 98, 105 (D.Colo.1971).

12. See *Haas v. Pittsburgh National Bank, supra*, at 806.

 The Court fails to comprehend NCB's reason for raising this argument, since NCB's own counsel admitted during an early stage of the oral argument on the instant motions that the class members would not be bound by the judgment in this case so long as no notice had issued to the class. NCB may mean to argue that the failure of the named plaintiffs to succeed on the merits of their claim should persuade the Court to decertify the class. This

argument must be rejected as improvident, however, since the judgment against the named plaintiffs does not prejudice the claims of the class, and defendant has knowingly assumed the risk that an ultimate victory for the named plaintiffs would bind defendant as to the claims of the class.

13. *Cohen v. District of Columbia Nat'l Bank*, 59 F.R.D. 84, 89 (D.D.C.1972).

14. *Id.*

15. *See Von Rosen v. Dean*, 59 App.D.C. 359, 41 F.2d 982 (1930); *Brown v. Slocum*, 30 App. D.C. 576 (1908).

16. *Cf. Werber v. Atkinson*, 84 A.2d 111, 113 (D.C.Mun.App., 1951). ("It is true that the

tion when the proper definition of the class was at issue, defendant should not be permitted to raise it two and one-half years after certification of the class. Class members with actual notice of this certified class action may have refrained from filing individual suits in the interim, believing that their interests were being represented by the Torosians. A second reason for treating NCB's prematurity argument as waived is that final payment on the third Torosian loan was made on April 7, 1971, and presumably most of the other personal unsecured installment loans that were outstanding on July 28, 1969, have also been repaid since this suit was filed. Causes of action for statutory damages having accrued with the final payments on these loans, NCB should not be permitted to raise the prematurity argument for the first time now when the limitations period for filing suit on those claims has passed.

■ Finally, the prematurity argument must be rejected as inapplicable to the claim of the named plaintiffs and the class for a declaratory judgment.[17] This Court is empowered by 28 U.S.C. § 2201 to declare the legality or illegality of the methods used to compute interest in this case and the usuriousness or legality of the rates of interest prescribed in the loan agreements. Although NCB cites several cases to support the contention that a suit for damages is the exclusive remedy available to plaintiffs,[18] those cases do not in fact prohibit suits for purely declaratory relief, even though no cause of action for damages may yet have accrued. The authorities cited by defendant merely justified the dismissal of claims for alternative types of monetary relief. In some of those cases the borrowers sued to invalidate the contract and to recover statutory damages before an amount equal to principal plus legal interest had been repaid,[19] and in the other cases the borrowers attempted to exercise a common law right to offset payments of usurious interest against the lenders' claims for the amounts due on the loan.[20] Although these cases would have provided ample support for NCB's argument that plaintiffs' damage claim was prematurely filed, if that argument had been timely raised, those cases do not preclude plaintiffs' claim for declaratory relief. Accordingly, the Court will not redefine the class to exclude those borrowers who had not paid more than principal plus legal interest on outstanding loans by the date of suit.

## MERITS OF THE CROSS–MOTIONS FOR SUMMARY JUDGMENT

At issue on these cross-motions for summary judgment is the usuriousness *vel non* of the interest rates charged on three personal unsecured installment loans that the plaintiffs, Luke and Peggy Torosian, obtained from NCB in 1966, 1968, and 1969, respectively.[21] The loan

defense of prematureness has been held to be waived when no timely objection was made.")

**17.** See Amended Complaint at 10, ¶ 2.

**18.** See *McBroom v. Scottish Mortgage & Land Investment Co.*, 153 U.S. 318, 14 S.Ct. 852, 38 L.Ed. 729 (1894); *Carter v. Carusi*, 112 U.S. 478, 5 S.Ct. 281, 28 L.Ed. 820 (1884); *Barnet v. National Bank*, 98 U.S. 555, 25 L.Ed. 212 (1878); *Von Rosen v. Dean*, 59 App.D.C. 359, 41 F.2d 982 (1930); *Brown v. Slocum*, 30 App. D.C. 576 (1908); *Lawrence v. Middle States Loan, Bldg. & Constr. Co.*, 7 App.D.C. 161 (1895).

**19.** See *McBroom, supra; Von Rosen, supra*.

**20.** See *Carter, supra; Barnet, supra; Lawrence, supra*. Since in *Brown, supra*, the plaintiff succeeded on the merits of her damages claim, the exclusivity language was merely dictum. See 30 App.D.C. at 580. A D.C. statute now permits the offsetting of usurious interest against lenders' claims on the contract. 28 D.C.Code § 3305 (1973 ed.).

**21.** Except for the interest rates, the terms of the loans are not in dispute. See Plaintiffs' and Defendant's Statements of Material Facts as to Which There is No Genuine Issue. The terms may be summarized as follows:

1. *The 1966 loan*: NCB paid to the Torosians $2,000. The Torosians signed a note obligating them to repay $2,194.30 in 23 equal monthly payments of $91.43, and a final payment of $91.41. The $2,194.30 obligation included designated amounts of $168.80 interest, $4.00 fee for credit investigation, and $21.50 premium for credit life

agreements specified the amount of the interest charge, but did not specify either the interest rate or the allocation of payments between principal and interest. The parties agree, however, that the interest rates on all three loans, as originally contracted for, exceeded the lawful 8% if computed according to the residuary method.[22] Defendant's computations, on the other hand, demonstrate that the interest rate on only one of plaintiffs' loans exceeded 8%, and then by only .04%, if computed according to the U. S. Rule.[23] The primary issue for decision, therefore, is whether an interest rate of 8% or less when computed according to the U. S. Rule satisfies the D.C. usury statute.

## UNITED STATES RULE VS. RESIDUARY METHOD

■ In ruling that the declining balance of principal must be taken into account in computing interest rates in the District of Columbia, this Court recognized and described various methods of computing interest rates, including the residuary method[24] and the U. S. Rule.[25] The Court's opinion noted that the residuary method allocates all installment payments to principal before allocating any of the payments to interest,[26] while the U. S. Rule allocates each installment payment first to the interest due, and, if the payment exceeds the interest due, the remainder of the payment is applied to diminish the balance of principal outstanding at the time of payment.[27] The residuary method of allocating payments results in the highest interest rate figure of all the computational methods, because it minimizes the period during which any balance of principal remains outstanding.[28] Therefore, the dollar amount of interest that can be charged without violating the usury laws is less if the residuary method is applied than if any other method is used.

insurance. The loan was paid in full on March 20, 1968, approximately six months before the final payment was due. NCB rebated $15.99 interest, reducing the actual interest paid by plaintiffs to $152.81.

2. *The 1968 loan*: NCB paid to the Torosians $2,300. The Torosians signed a note obligating them to repay $2,523.88, in 23 equal monthly payments of $105, and a final payment of $108.88. The $2,523.88 obligation included designated amounts of $194.15 interest, $5.00 credit investigation fee, and $24.73 premium for credit life insurance. The loan was paid in full on April 7, 1969, approximately 11½ months before the final payment was due. NCB rebated $42.88 interest, reducing the actual interest paid by plaintiffs to $151.27.

3. *The 1969 loan*: NCB paid to the Torosians $2,000. The Torosians signed a note obligating them to repay $2,194.08 in 23 equal monthly payments of $92.00, and a final payment of $78.08. The $2,194.08 obligation included designated amounts of $172.58 interest, and $21.50 premium for credit life insurance. The loan was paid over the entire 24-month term.

22. See Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment, and Appendix attached thereto; see also Defendant's Answer to Plaintiffs' Interrogatory No. 6.

23. See Schedules A–2, B–2, and C–3, attached to Affidavit of Larry V. Thomas, attached to defendant's Motion for Summary Judgment. According to the affidavit of NCB's legal advisor, Mr. George A. Didden, Jr., and NCB's interrogatory answers, NCB has in fact used the U. S. Rule to compute interest on all NCB loans for the past 30 years. See Defendant's Answers to Plaintiffs' Interrogatories, Nos. 12 and 13.

24. See *Cohen v. District of Columbia Nat'l Bank*, 382 F.Supp. 270, 287–91 (D.D.C.1974). Six methods of computing interest rates are described in M. Ayres, *Instalment Mathematics Handbook* (1946), 209 *et seq.*

25. 382 F.Supp. at 278–79.

26. *Id.* at 287.

27. See *id.* at 278–79.

28. See *id.* at 287–91; see also *M. Ayres, supra,* 209 *et seq.* As demonstrated by the appendix to the prior opinion in this case, 382 F.Supp. at 287–91, the allocation method affects the interest rate figure by increasing or decreasing the sum of the periodic balances of principal. Since the formula for computing annual interest rates divides the total interest charge by the sum of the balances of principal outstanding after each periodic payment and then multiplies the resulting figure by the number of installment periods per year, the interest rate increases as the sum of the outstanding balances of principal decreases. See also *M. Ayres, supra,* at 19–21.

The prior ruling on the usuriousness of the loans made by D.C. National Bank did not necessitate any ruling on the acceptability of the various methods of computing interest rates. The demonstrated facts, and D.C. National's admissions, established at the time of the prior rulings that the interest rates on the loans made by D.C. National exceeded 8% no matter which method was used to compute the interest rate on the declining balances of principal. Indeed, the Bank admitted that it did not take the declining balances of principal into account in computing the interest' charge.[29] Thus the only issue decided was whether the declining balances of principal had to be taken into account in computing the interest rate for purposes of demonstrating compliance with 28 D.C.Code § 3301.

To support the present contention that the residuary method must be used in computing interest rates for purposes of 28 D.C.Code §§ 3301 and 3303, plaintiffs rely on the District of Columbia cases that have construed 28 D.C.Code §§ 3304 and 3305. Section 3304 creates a cause of action to recover usury paid and establishes a one year statute of limitations applicable to such suits. Section 3305 gives debtors a right to offset usurious interest in suits brought by creditors seeking to recover on usurious contracts. Plaintiffs argue that §§ 3304 and 3305 apply the residuary method, and that consistency demands application of that method for purposes of §§ 3301 and 3303 as well. In so arguing, plaintiffs admit that no District of Columbia cases have held that the residuary method must be used to compute interest for purposes of §§ 3301 and 3303.

Plaintiffs' position lacks merit for several reasons. As noted in this Court's prior opinion,[30] the United States Supreme Court endorsed the U. S. Rule in *Story v. Livingston*,[31] in 1839. In *Story*, the Court referred to the U. S. Rule as "the correct rule, in general," [32] and that rule has remained since 1839 the general rule governing the application to principal and interest of undesignated payments upon a debt, in the absence of a statute or agreement to the contrary.[33] The U. S. Rule is a proper method for determining the "Annual Percentage Rate" for disclosure purposes under the Federal Truth in Lending Act,[34] and, since the filing of this suit, the District of Columbia has adopted the U. S. Rule by statute as a proper method for computing interest on unsecured installment loans.[35] Plaintiffs in this case do not dispute the averments of Robert C. Collett to the effect that all interest bearing bonds and federal mortgage loans and home improvement loans are based on the U. S. Rule.[36] Moreover, during oral argument on the instant motions, plaintiffs' attorney conceded that, to his knowledge, the only banks in the District of Columbia that employ the residuary method in computing interest are the former defendants in this case who agreed to use the residuary method as a condition of settlement. Thus the U. S. Rule has for many years enjoyed the approval of courts and legislatures alike throughout the country. Plaintiffs bear a heavy burden in this case, therefore, as they attempt to persuade this Court to invalidate computations of interest according to the U. S. Rule in the District of Columbia.

That the residuary method is used for purposes of 28 D.C.Code § 3305 does not

---

29. See *id.* at 274–75.

30. *Id.* at 278.

31. 38 U.S. (13 Pet.) 359, 10 L.Ed. 200 (1839).

32. *Id.* at 370.

33. See *Nat G. Harrison Overseas Corp. v. American Barge Sun Coaster*, 475 F.2d 504, 507 (5th Cir. 1973); *United States v. Speed Queen Corp.*, 210 F.2d 357, 358 (7th Cir. 1954); *Barker v. Magruder*, 68 App.D.C. 211, 213, 95 F.2d 122, 124 (1938); *Ohio Savings Bank & Trust Co. v. Willys Corp.*, 8 F.2d 463, 467 (2d Cir. 1925); 70 C.J.S. Payment § 75; 47 C.J.S. Interest § 66; 45 Am.Jur.2d, Interest and Usury, § 99.

34. See 15 U.S.C. § 1606 (1970); 12 C.F.R. § 226.5(b)(2) (1975).

35. 28 D.C.Code § 3308(e) (1973 ed.).

36. See affidavit of Robert C. Collett, at 2.

persuade the Court to engraft that method onto §§ 3301 and 3303 to the exclusion of the U. S. Rule and in the absence of any indication that Congress or the courts of the District of Columbia intend that result. Section 3305 by its terms applies only *after* the contract sued upon has been held usurious. Indeed the general rule throughout the country is to apply the residuary method in applying for purposes of allowing a setoff of interest after a contract has been held usurious.[37] Moreover, in the situation provided for by § 3305, i. e., where a defendant seeks to offset interest against a creditor's suit upon a usurious contract, the residuary method is the only method that can accomplish the purpose of the D.C. usury statute as a whole [38] to limit the creditor's recovery to the principal amount, thereby penalizing the creditor in the amount of the interest charged.[39] If in a suit to recover the balance due on a loan contract, the payments were not allocated solely to principal as long as any principal remained outstanding, the creditor's recovery on the contract would exceed the amount of principal lent by the amount that had been credited to interest prior to suit.[40] By using the residuary method for offsetting interest in § 3305 situations, § 3305 imposes the same penalty as that imposed by §§ 3303 and 3304 in debtors' suits for damages. The use of the residuary method, of necessity, to achieve this result under § 3305 by no means implies that the interest rate on the loan contract sued upon must initially be computed according to the residuary method.

The District of Columbia cases that have applied 28 D.C.Code § 3304 likewise lend no support to plaintiffs' position here. Plaintiffs contend that the District of Columbia courts have used a residuary method in determining when the one year statute of limitations embodied in § 3304 begins to run. The cases plaintiffs cite, however, seem to the Court to prescribe a rule for measuring the limitations period that is totally independent of the method used in computing the interest rate. In *Brown v. Slocum*,[41] the principal case cited by plaintiffs, the Supreme Court of the District of Columbia had to determine whether, when interest is deducted in advance, or "discounted," [42] from the face amount of a usurious loan, the limitations period begins to run at the time of the discount or at some later time. The Court did not compute the interest rate or indicate which method should be used in computing the interest rate, for the defendant admitted that the loan was usurious.[43] In ruling that the statute began to run when the last payment was made, the Court made this statement:

> Here the appellee paid the full face [sic] of the note, and has adopted the only remedy offered by the law to recover usury by bringing suit for the amount of the interest paid. We think her cause of action did not accrue until the last payment was made. Until that time the full amount of the deduction had not been paid by her. There could be no usurious interest collected until the appellee had paid the full amount she received, together with legal interest. This time did not occur until within less than a year of the bringing of this suit.[44]

Nothing in the quoted language indicates whether the Court allocated the plaintiff's payments according to the re-

---

37. See 45 Am.Jur.2d, Interest and Usury § 244.

38. See 28 D.C.Code §§ 3303, 3304, 3305.

39. See *Searl v. Earll*, 95 U.S.App.D.C. 151, 221 F.2d 24, 29 (1954); *Bowen v. Mount Vernon Savings Bank*, 70 App.D.C. 273, 105 F.2d 796 (1939).

40. Cf. *McBroom v. Scottish Mortgage & Land Investment Co.*, 153 U.S. 318, 329 (1894).

41. 30 App.D.C. 576 (1908).

42. See explanation of a discount loan in this Court's prior opinion in this case. 382 F.Supp. at 274.

43. See 30 App.D.C. at 579.

44. *Id.* at 580.

siduary method or the U. S. Rule for purposes of commencing the running of the limitation period, and as noted above, computation of the interest rate on the loan was not necessary since usury had been conceded. In commencing the running of the limitations period upon the making of the last payment, the Court apparently believed that no cause of action should lie to recover the full amount of interest charged, which is the measure of damages prescribed by § 3304,[45] until the plaintiff had actually paid the full amount of interest. Since the interest charged in *Brown* had been discounted from the face amount of the obligation, this would explain the sentence "until that time [of the last payment] the full amount of the deduction had not been paid by her."

The statement that no usurious interest could be collected "until the appellee had paid the full amount she received, together with legal interest" does not necessarily indicate that the Court used the residuary method in allocating payments, considering the statistics involved in the *Brown* case.[46] It appears likely that the principal plus legal interest had been paid in *Brown* before the final payment, or even before the next to last payment, whether the payments were allocated according to the residuary method or the U. S. Rule.[47] Even if the quoted language does indicate that the Court applied the residuary method, this would

simply demonstrate adherence to the general rule that the residuary method applies *after* a contract has been held usurious. Thus *Brown* stands for no more than that the limitations period in actions brought to recover usurious interest paid commences with the final payment on the loan.[48] The other cases cited by plaintiffs add nothing to this reading of *Brown*.[49]

Given the distinguishable considerations that require the use of the residuary method in offsetting interest in § 3305 suits, the Court finds no justification in the law of the District of Columbia for disqualifying the U. S. Rule as a proper method for computing interest rates. Moreover, the Court does not share plaintiffs' fears that this ruling will overly complicate the litigation of usury suits, since the cases cited by plaintiffs do not eliminate the likelihood that the U. S. Rule has always been used in computing interest rates for purposes of §§ 3301 and 3303 by District of Columbia courts.[50]

### INTEREST RATES ON THE THREE TOROSIAN LOANS, COMPUTED ACCORDING TO THE U. S. RULE, ARE NOT USURIOUS

The computational tables A–2, B–2, and C–3,[51] attached to defendant's motion for summary judgment, established that the interest rates on the three Torosian loans equalled 7.78%, 7.77%, and

---

**45.** *Searl v. Earll,* 95 U.S.App.D.C. 151, 221 F.2d 24, 29 (1954).

**46.** The face amount of the obligation was $183.60, which included $48.60 in legal and usurious interest. The $183.60 was repaid in twelve monthly installments of $15.30. $135.00 was the principal amount tendered. Plaintiff sued to recover the entire $48.60 in interest. *See id.* at 577–79.

**47.** Plaintiffs contend that principal plus usurious interest would necessarily have been paid in *Brown* before the last payment if the payments had been allocated according to the U. S. Rule. This contention overlooks two crucial points, the first of which is mentioned *supra* in the text. Also, plaintiffs apparently do not understand that in allocating payments pursuant to the U. S. Rule, each payment would be allocated to the interest due at the *lawful* rate

so long as any principal remained outstanding. See *Story v. Livingston,* 38 U.S. (13 Pet.) 359, 370, 10 L.Ed. 200, 206 (1839).

**48.** A recent case indicates that the D.C. Court of Appeals may have changed its view of the proper time to commence the running of the limitations period. See *Montgomery Federal Savings & Loan Ass'n v. Baer,* 308 A.2d 768, 769 n. 6 (D.C.App.1973) (statute runs from date of payment of usurious interest).

**49.** *Von Rosen v. Dean,* 59 App.D.C. 359, 360, 41 F.2d 982 (1930); *Knott v. Jackson,* 31 A.2d 662, 666 (D.C.Mun.App.1942).

**50.** This likelihood is underscored by *Montgomery Federal Savings & Loan Ass'n v. Baer,* 308 A.2d 768, 772–73 (D.C.App.1973).

**51.** The computations in Schedules A–2, B–2, and C–2 assume the note to be paid according

8.04% when computed according to the U. S. Rule. Thus only on the third loan did the payments yield interest at a rate greater than 8%, and on that loan the excess equalled only four one-hundredths of one percent. Translated into dollars, the overcharge on a total interest charge of $172.58 equalled only 74 cents, as plaintiffs' attorney freely admitted during oral argument on these motions. This 74 cents overcharge resulted from rounding off the monthly payment amounts from $91.42 to $92.00 for the first 23 months.[52] Payments of $91.42 would have yielded interest at the rate of 8%.[53]

■ The 74 cents overcharge on this loan is simply not the type of abuse that usury laws are enacted to correct. It appears that the rounding-off which caused the overcharge occurred because a loan officer failed to follow the policy of the Bank, which had instructed its loan officers not to deviate from the charts that set forth loan terms calculated to yield 8% interest according to the U. S. Rule.[54] Thus, aside from the *de minimis* nature of this overcharge, the overcharge must also be excused as inadvertent on the part of the Bank.[55] The three Torosian loans are therefore not usurious, and summary judgment must be granted for defendant. Summary judgment for plaintiffs is denied.

to the specified terms of the loan—that is, paid over the originally scheduled 24 month term of the loan rather than prepaid, as actually occurred on the first and second loans. Schedules A–3, B–3, and C–3 compute the interest rates over the actual loan period, taking into account the interest rebates on the first two loans. Schedules A–3, B–3, and C–2 yield interest rate figures of 7.63% and 7.86% and 8.04%, respectively.

Recognizing that the first and second loans are not usurious even if computed over the actual terms, the Court nonetheless cites Schedules A–2 and B–2 in preference to A–3 and B–3 in reliance on *Atlantic Life Ins. Co. v. Wolf*, 54 A.2d 641 (D.C.Mun.App.1947). *Wolf* held that a contract which is non-usurious according to its original terms cannot be rendered usurious by the borrower's voluntary act of prepayment. See *id.* at 643; see also *Montgomery Federal Savings, supra,* at 772–73.

Schedules A–1, B–1, and C–1 use a 360-day year in computing the interest rate.

52. See Schedules C–1 and C–2, attached to Affidavit of Larry V. Thomas, attached to defendant's Motion for Summary Judgment.

53. *Id.*

54. See Affidavit of George A. Didden, Jr., at 5.

55. See *Ragge v. Bryan*, 249 Ark. 164, 458 S.W.2d 403 (1970); *Smith v. Sherwood & Roberts, Spokane, Inc.,* 92 Idaho 248, 441 P.2d 158 (1968) ($8 overcharge on $460 total interest held not usurious); *Flax v. Mutual Bldg. & Loan Ass'n,* 198 Mich. 676, 165 N.W. 835 (1917); *Methvin v. Mutual Savings & Loan Ass'n,* 180 Okl. 80, 67 P.2d 792 (1937) (20 cents interest overcharge on $6000 debt held *de minimis*); *Guetersloh v. C. I. T. Corp.,* 451 S.W.2d 759 (Tex.Civ.App.1970).